# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-1596

TERRY TIFFT, JIM CRUTCHFIELD, JUANITA DIXON, et al.,

*Plaintiffs-Appellants*,

v.

COMMONWEALTH EDISON COMPANY,
and EXELON CORPORATION,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 C 4110—**Ruben Castillo**, *Judge.*

_____

ARGUED NOVEMBER 7, 2003—DECIDED APRIL 27, 2004

_____

Before COFFEY, RIPPLE, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.*

## I. History

Defendant-Appellee Exelon Corporation, through its sub-sidiaries, including Defendant-Appellee Commonwealth Edison Company ("ComEd"), generates and distributes electricity to commercial, residential, and industrial con-sumers in Illinois. Exelon was formed in 2000 as the result

of a merger between the parent company of ComEd and Peco Energy ("Peco"). The Plaintiffs-Appellants were all employed at various facilities operated by corporate entities related to Exelon and ComEd ("Defendants") and, during their employment, were represented by Local Union 15 of the International Brotherhood of Electrical Workers ("Union"). As Union members, the Plaintiffs were covered by a collective bargaining agreement ("CBA") which, along with various side agreements, governed the terms and conditions of their employment.

Two such side agreements included a Memorandum of Understanding ("MOU") and Utility Agreement ("UA") entered into by the Union and the Defendants.[1] This was done in anticipation of the effective date of the Electric Service Customer Choice and Rate Relief Law of 1997, 220 Ill. Comp. Stat. 5/16-101, *et seq.* ("Electric Service Law" or "ESL"), which applied to the Defendants. These agreements addressed, among other issues, employees' rights and entitlements in the event of workforce reductions covered by the ESL. Specifically, the MOU addressed workforce reductions described in section 5/16-128(b), and the UA discussed severance packages for employees laid off during reductions covered by the ESL.

In part as a result of the merger between ComEd and Peco, the Defendants began plant closures and workforce reductions in July and September of 2001. Prior to their layoffs, the Plaintiffs were given two options: (1) in lieu of being laid off, they could accept a demotion to a lesser position with a lower rate of pay; and (2) if laid off, in exchange for waiving their right to be "recalled" under the

---

[1] These agreements were actually entered into by a number of local unions, including the Plaintiffs' union, the International Brotherhood of Electrical Workers International Union, and several electric utilities, including the Defendants.

CBA,[2] they could receive a severance benefit. Approximately twelve of the fourteen plaintiffs were offered demotions, and two employees were laid off.

They then filed suit in the Circuit Court of Cook County, Illinois, alleging wrongful termination, in violation of the ESL. Plaintiffs requested that the state court imply a private right of action under the ESL and sought both equitable and legal remedies. On June 7, 2002, the Defendants timely removed this action, 28 U.S.C. §§ 1441, 1446 (2002), to federal court on the grounds that any assessment of the alleged ESL violations would require the district court to interpret the CBA and/or other agreements and hence, the Plaintiffs' claims are completely preempted by section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) (2002). The Plaintiffs then unsuccessfully attempted to have the case remanded to Illinois state court, 28 U.S.C. § 1447(c). This appeal resulted, and for the following reasons we affirm the district court's denial of the Plaintiffs' motion to remand.[3]

---

[2] Recall refers to the process by which employees, previously laid off due to economic necessity, begin working again as economic circumstances improve. This process by which employees are brought back to work is governed by the employees' CBA, taking into account employees' seniority and other factors. During the layoff period, although employees are not working (and hence not earning any wages), they are still covered by the CBA.

[3] The district court's order in this case became final for purposes of our review when the Plaintiffs chose not to file an amended complaint. The district court administratively closed this case on February 27, 2003 and the Plaintiffs filed Notices of Appeal on February 26 and March 24—the second filing as a precautionary measure just in case we determined that the adjudication in the district court was not "final" until administratively closed. We treat the finality requirement of 28 U.S.C. § 1291 practically, not

(continued...)

## II.  Analysis

We review the propriety of removal de novo. *Garratt v. Knowles*, 245 F.3d 941, 946 (7th Cir. 2001); *Moran v. Rush Prudential HMO, Inc.*, 230 F.3d 959, 966 (7th Cir. 2000) (citation omitted), *aff'd*, 536 U.S. 355 (2002). Similarly, we also review a district court's preemption ruling de novo. *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 987 (7th Cir. 2000) (citations omitted).

Removal to a district court is appropriate when a cause of action "arises under" federal law. *See* 28 U.S.C. §§ 1331, 1441(a). And although a court will look to the face of a properly pleaded complaint to see if a federal question is present, *Caterpillar, Inc. v. Williams*, 482 U.S. 386 (1987) (laying out the "well-pleaded complaint" rule), a plaintiff cannot avoid a federal forum by "artfully pleading" what is, in essence, a federal claim solely in terms of state law, *see, e.g.*, *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 22 (1983). Furthermore, when "a federal cause of action completely preempts a state cause of action, any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law." 463 U.S. at 24. Due to the importance of uniformity in labor law, any state law claim "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract" will be completely preempted by section 301 of the LMRA. *Allis-Chalmers Corp. v. Leuck*, 471 U.S. 202, 220 (1985) (citation omitted); *see also Loewen Group Int'l, Inc. v. Haberichter*, 65 F.3d 1417, 1421 (7th Cir. 1995) (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403 (1988)). However, where a state law cause of action

---

(...continued)
technically, and thus, Judge Castillo's ruling is final for purposes of appeal and we have jurisdiction. *See, e.g.*, *Garratt v. Knowles*, 245 F.3d 941, 945 (7th Cir. 2001).

requires mere reference to a CBA, section 301 preemption will not necessarily apply. *See Livadas v. Bradshaw*, 512 U.S. 107, 117-18 (1994) (state claim not preempted where reference to CBA needed only to calculate damages for wrongful discharge); 471 U.S. at 211; *In re Bentz Metal Prod. Co.*, 253 F.3d 283, 289 (7th Cir. 2001) (no preemption where state law issue was the priority of mechanics' liens for vacation pay owed under the CBA). Thus, in this case, although the Plaintiffs' complaint characterized their claims as arising wholly under the ESL, removal was nonetheless appropriate if the Plaintiff's claims require an interpretation of, and not simply reference to, the CBA and/or other labor agreements. *See, e.g.*, *Beneficial Nat'l Bank v. Anderson*, 539 U.S. ___, 123 S. Ct. 2058, 2062 (2003); *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 498 (7th Cir. 1996).

The Plaintiffs argue that there is no preemption because no (or very little) interpretation of the CBA is necessary. And no interpretation of the CBA is necessary because the Defendants' acts were allegedly in clear violation of section 5/16-128 of the ESL.[4] Under the Plaintiffs' reading of section 5/16-128(a)(3), (b), and (c), following the transfer of ownership of an Illinois electric utility, such an entity must maintain the "status quo" of all non-supervisory utility employees' compensation and cannot either lay off or demote such workers for at least thirty months. (R. 1, Ex. B at 8-9; Appellant's Br. at 8-9, 16.) Because the Plaintiffs were laid off or demoted within thirty months of the merger, they assert that the Defendants violated the ESL. And thus, because the Defendants are clearly liable for

---

[4] We assume, for purposes of this appeal, that a private right of action is implied under the ESL. Despite Plaintiffs' arguments to the contrary, for the purposes of our removal and preemption analysis, the issue is wholly irrelevant. Hence, it is left for the trial court to determine.

damages under their reading, a court need not look to the CBA or any other agreement. Put differently, the premise of all the Plaintiffs' arguments is that the ESL prohibits the layoff or demotion of any non-supervisory employee within thirty months of a transfer of ownership. We disagree.

The ESL was part of the electric, natural gas, and telephone deregulatory wave that swept the nation in the late 1990's. Policymakers, concerned over high prices and poor service quality, began to abandon the traditional assumption that utilities were natural monopolies. Robert Kelter, *Peace, Love, Competition. An Initial Look at the Restructuring of Illinois Residential Energy Markets*, 33 Loy. U. Chi. L.J. 875, 875-76 (2002). To do away with legislatively-sanctioned monopolies and to increase competition, policymakers adopted laws which lowered barriers to market entry in these industries. Thus, legislators hoped, efficiency would increase, new products would be developed, and prices would decrease. *See* 220 Ill. Comp. Stat. 5/16-101A (2003). Spurred by such changes in the federal regulatory scheme and in other states, the Illinois legislature adopted the ESL, its own attempt "to accommodate the competition that could fundamentally alter the structure of the electric services market." *Id.*

Increases in efficiency are, in part, the result of new market entrants' and existing participants' utilization of mergers, consolidations, and other transfers of ownership to reap the benefits of economies of scale and relative competitive advantages. But such transfers in ownership also typically result in the reduction of the workforce, at least as the market adjusts to increased competition. Recognizing this economic reality, the ESL sought to lessen the adverse effect of deregulation on electric services workers. 220 Ill. Comp. Stat. 5/16-128(a)(3), (b). Hence, the Plaintiffs are correct in their assertion that "the Illinois legislature clearly indicated its intent to protect [utility workers.]" (Appellant's Br. at 8.) But they misapprehend both the basic

economics of deregulation, which predicts the elimination of some jobs in the short run, and, more critically, the ESL's express acceptance of that reality. *See* 220 Ill. Comp. Stat. 5/16-128(a)(3), (b) (stating "the impacts on employees . . . of any *necessary reductions* in the utility workforce . . . shall be mitigated to the extent practicable through such means as offers of voluntary severance, retraining, early retirement, outplacement, and related benefits.") (emphasis added).

No provision of the ESL prohibits the reduction of the workforce, prohibits agreed-upon demotions, or guarantees any specific type of severance or other benefit to those employees that are laid off. If the ESL imposed such obligations on the electric utilities, the economic rationale supporting deregulation would be significantly diminished. Although the structure of section 5/16-128 confuses its logic, the obligations it does impose on utilities engaging in a transfer of ownership are organized according to whom the obligation is owed. In relevant part, the ESL states:

> (b) . . . The General Assembly further finds that the impacts on employees and their communities of any *necessary reductions* in the utility workforce directly caused by this restructuring of the electric industry *shall be mitigated to the extent practicable* through such means as offers of voluntary severance, retraining, early retirement, outplacement, and related benefits. Therefore, before any such reduction in the workforce during the transition period, *an electric utility shall present to its employees or their representatives a workforce reduction plan outlining the means by which the electric utility intends to mitigate the impact of such workforce reduction.*

> (c) In the event of a . . . transfer of ownership during the mandatory transition period . . . the electric utility's contract and/or agreements with the acquiring entity or persons *shall require that the entity or persons hire a*

*sufficient number of non-supervisory employees to operate and maintain [the utility]. . .* by initially making offers of employment to the non-supervisory workforce . . . *at no less than the wage rates, and substantially equivalent fringe benefits and terms and conditions of employment* that are in effect at the time of transfer of ownership . . . ; and said wage rates and substantially equivalent fringe benefits and terms and conditions of employment shall continue for at least 30 months . . . unless the parties mutually agree to different terms and conditions . . . . *The utility shall offer a transition plan to those employees who are not offered jobs by the acquiring entity because that entity has a need for fewer workers.*

220 Ill. Comp. Stat. 5/16-128 (emphasis added). Hence, the ESL required the Defendant utilities to: (1) present a "workforce reduction plan" to *all workers* or their representatives prior to implementing layoffs, 5/16-128(b); (2) following the merger, offer a "transition plan" to *employees who would be laid off*, 5/16-128(c); and (3) following the merger, hire (i.e., continue to employ) enough non-supervisory *employees necessary to* "*operate and maintain*" *the utility* (and who therefore would not be laid off), with the same wages, fringe benefits, and terms of employment for at least thirty months, unless the parties agree otherwise, 5/16-128(c).

Stepping back to look at the bigger picture, given the dynamic changes which occur as competition is introduced to an industry, the ESL seeks to encourage labor and management interaction and negotiation during these transitions, so that market disruptions and negative employment effects are kept to a minimum. As stated above, the ESL essentially requires negotiation between labor and management regarding the implementation of layoffs and the benefits for employees who will be laid off. And for employees whose employment will continue after the

merger, where agreement cannot otherwise be reached, the legislation protects those employees by guaranteeing their wages, benefits, and terms of employment for thirty months. Had the Defendants offered no "workforce reduction plan" to employees, nor any "transition plan" to laid-off employees, nor reached any agreements with employees who continued to work after the merger (i.e., the demotion agreements) while simultaneously refusing to honor their existing employment arrangements, then the ESL clearly would have been violated. And, as the Plaintiffs allege, the district court would then have had no need to interpret the CBA or any other agreements, their state law claim would be independent of the CBA, and their claims would not have been preempted by section 301 of the LMRA. *Cf. Caterpillar*, 482 U.S. at 395; *Goetzke v. Ferro Corp.*, 280 F.3d 766, 779 (7th Cir. 2002) (state law retaliatory discharge claim not preempted); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 991 (9th Cir. 2001) (state law tortious interference with contract claim not preempted); *Voilas v. General Motors Corp*, 170 F.3d 367 (3d Cir. 1999) (state fraud claim not preempted).

But instead, the Defendants did comply with the most basic requirements of section 5/16-128 of the ESL on its face. All of the Plaintiffs, through their Union, negotiated and reached three agreements with the Defendants: the CBA, MOU, and UA. The layoffs and demotions at issue here are covered by the CBA generally, and in greater detail by the MOU, addressing the workforce reductions described in section 5/16-128(b), and by the UA, addressing severance packages for laid-off employees. Furthermore, each individual Plaintiff who was offered a demotion was free to reject that offer, and, assuming they were subsequently laid off, hold the Defendants to their obligations under the CBA, MOU, and UA. If they chose to accept the demotion to continue to work, then they reached an alternate agreement, as explicitly contemplated by the ESL in section 5/16-128(c).

Therefore, whether the Defendants violated the ESL will require a "substantive examination" of the CBA, MOU, and UA to determine (1) if the agreements properly embodied the directives of the ESL; and (2) if the Defendants failed to comply with the terms of these agreements. *Loewen*, 65 F.3d at 1423-24. Admittedly, the Plaintiffs are correct in their assertions that "the language of the ESL does not reference a [CBA] at all," and, assuming the ESL creates a private right of action, a non-union employee could therefore file an action under the ESL. (Appellants' Opening Br. at 21-22.) But the employees in this case are covered by collectively bargained agreements, two of which are the direct result of the ESL's requirements, and hence, the ESL does not create any rights independent of those agreements. As pointed out above, the state-law cause of action is meaningless without reference to the agreements which articulate the Defendants' obligations toward these Plaintiffs. *See Gibson v. AT&T Techs., Inc.*, 782 F.2d 686, 688 (7th Cir.), *cert. denied*, 477 U.S. 905 (1986); *Dougherty v. Am. Tel. and Tel. Co.*, 902 F.2d 201, 204 (2d Cir. 2001); *Commonwealth Edison Co. v. Int'l Brotherhood of Elec. Workers, Local Union No. 15*, 961 F. Supp. 1154, 1162 (N.D. Ill. 1996).

Whether the CBA, MOU, and UA properly incorporated the directives of the ESL and whether Defendants respected the employees' rights as agreed to in those agreements—and therefore whether they did or did not violate the ESL—will require analysis of, for example, the process the Defendants used to lay off and rehire employees post-merger, pay severance and other benefits, recall laid-off workers, and handle employee grievances. This requires more than mere reference to the collectively bargained agreements. The ESL, in this case, does not provide the Plaintiffs with rights independent of the CBA, MOU, and UA. Therefore, section 301 of the LMRA preempts the Plaintiffs' state law claims and the case was properly removed to federal court.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of the Plaintiffs' motion to remand.


A true Copy:

    Teste:


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*