

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-12-1996

# Jeremy H v. Mt Lebanon Schl Dist

Precedential or Non-Precedential:

Docket 95-3355

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Jeremy H v. Mt Lebanon Schl Dist" (1996). *1996 Decisions.* Paper 71.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/71

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 95-3355
_____

JEREMY H., a Minor, by his Father and Next Friend,
W.E. HUNTER; W.E. HUNTER, on His Own Behalf; RITA HUNTER

v.

MOUNT LEBANON SCHOOL DISTRICT; ROBERT GERMAN, personally
and in his official capacity as a member of the Mount
Lebanon School Board; JUDY MCVERRY, personally and in her
official capacity as a member of the Mount Lebanon School
Board; MARIE LORETTA HUMPHREYS, personally and in her
official capacity as a member of the Mount Lebanon
School Board; HENRY J. KASKI, personally and in his official
capacity as a member of the Mount Lebanon School Board;
CAROL J. WALTON, personally and in her official capacity as a
member of the Mount Lebanon School Board; TEMPLETON SMITH,
personally and in his official capacity as a member of
the Mount Lebanon School Board; JEAN PALCHO, personally and in
her official capacity as a member of the Mount Lebanon
School Board; BEVERLY MAURHOFF, personally and in her
official capacity as a member of the Mount Lebanon
School Board; DR. GLENN SMARTSCHAN, personally and in
his official capacity as Superintendent of the Mount Lebanon
School Board; DR. DEBORAH ALLEN, personally and in her
official capacity as Director of Pupil Services of the
Mount Lebanon School District; DR. MONICA SULLIVAN,
personally and in her official capacity as Supervisor
of Special Education of the Mount Lebanon School District;
DR. LINDA MILLER, personally and in her official capacity as
Supervisor of Special Education of the Mount Lebanon
School District

JEREMY H., a minor, and W.E. HUNTER,
Appellants

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania

D.C. No. 94-cv-00114
_____

Argued March 21, 1996

                Before:  BECKER and McKEE, Circuit Judges
and POLLAK, District Judge

                    (Filed September 12, 1996)

                        Frank J. Laski (argued)
                        Public Interest Law Center
                            of Philadelphia
                        125 S. 9th St., Suite 700
                        Philadelphia, PA 19107
                          Attorney for Appellants

                        William C. Andrews (argued)
                        Andrew J. Leger, Jr.
                        Maiello, Andrews & Price
                        3301 McCrady Road
                        One Churchill Park
                        Pittsburgh, PA 15235

                        James C. Kletter
                        Springer, Bush & Perry
                        Two Gateway Center
                        15th Floor
                        Pittsburgh, PA 15222
                          Attorneys for Appellees

_____

OPINION OF THE COURT
_____

POLLAK, District Judge.

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., requires states which accept federal funding for the education of disabled children to insure that those children receive a "free appropriate public education."  20 U.S.C. § 1415(a).  The plaintiffs before us in this case   Jeremy Hunter, who has a severe visual handicap, his father, W. Eugene Hunter, and his mother, Rita Hunter (collectively, "the Hunters")   assert that the Mount Lebanon School District and its staff have, over the course of many years, failed to provide the "appropriate" educational program to which Jeremy Hunter has been entitled.  As is required by IDEA, the Hunters initially invoked a Pennsylvania administrative procedure established to resolve such claims. Dissatisfied, they then filed a complaint in federal district court, in which they brought claims under a number of statutes: IDEA; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; the Rehabilitation Act, 29 U.S.C. §§ 720, 794; and 42 U.S.C. § 1983.  They named as defendants the Mount Lebanon School District; eight members of the Mount Lebanon School Board (sued both in their official and in their individual capacities); and four officials of the Mount Lebanon School District (also sued in both their official and their individual capacities).

The defendants filed a motion to dismiss, asserting, inter alia, that the Hunters' IDEA claims were barred by the statute of

limitations and by the Hunters' failure to exhaust administrative remedies. The district court granted this motion as to all of the Hunters' claims, and ordered that the complaint be dismissed. The Hunters have appealed.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Our recitation of this case's long history is largely derived from the allegations in the Hunters' complaint. The principal figure in this history, Jeremy Hunter, was born on September 6, 1976. Before he entered kindergarten, he was diagnosed with Brown's Syndrome, a vision disorder, in his left eye, and with occlusional nystagmus, also a vision disorder, in both eyes. Brown's Syndrome apparently renders it difficult to maintain binocular vision, which in turn causes "reduced reading rate and orientation and mobility problems." Occlusional nystagmus causes fatigue, rendering it difficult for a student to read for long periods. App. at 14-15.

In January, 1982, while he was in kindergarten, Jeremy had surgery to correct his Brown's Syndrome; this surgery was reported (apparently erroneously) to have corrected his problem. App. at 14-15. A year later, Mount Lebanon School District (MLSD) determined that Jeremy was eligible to receive special education services. For the next six years, Jeremy received such services from vision teachers provided by the School District. Over this period, the School District conducted a series of assessments of Jeremy's educational needs; these assessments were termed multidisciplinary evaluations, because they included contributions from a variety of specialists. Based on these evaluations, MLSD prepared annual individualized education plans, or IEPs, for Jeremy.

During this six-year period, the complaint states, Jeremy experienced difficulty with "reading, completing assignments, and orientation and mobility," App. at 108, problems that the Hunters aver resulted from the defendants' failure adequately to accommodate his disability. As a result of these difficulties, Jeremy had a number of bouts of serious anxiety about school. In the fall of 1989, when Jeremy was about to enter junior high school, his parents concluded that his emotional condition required that they withdraw him from public school. The Hunters placed their son in private (and later in parochial) school, where, the complaint states, he received services that were more appropriate to his needs. The Hunters also hired a number of private vision teachers for Jeremy, and helped him with his homework themselves.

Jeremy's parents continued to press MLSD to provide Jeremy with an appropriate public education. Accordingly, in late 1990 and early 1991, the District conducted another multidisciplinary evaluation, and prepared another IEP, apparently without providing Jeremy's parents with an opportunity to participate in this process. Jeremy's parents were dissatisfied with the composition of the team conducting the multidisciplinary evaluation and with the evaluation's results, as well as with the results of the IEP, and responded by invoking the IDEA administrative dispute-resolution procedure.

IDEA (1) requires that state educational agencies which

receive federal assistance establish administrative procedures for resolving disputes as to the education of disabled children, and (2) provides certain criteria for those procedures. See 20 U.S.C. § 1415. These procedures are intended "to assure that children with disabilities and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies and units." 20 U.S.C. § 1415(a). IDEA envisions a three-stage dispute-resolution process. The initial stage is a hearing, at which the parties are afforded enumerated procedural protections. See § 1415(b), (d). Parties aggrieved by the findings and decision of the hearing process may appeal to the state's educational agency. See 20 U.S.C. § 1415(c). Thereafter, IDEA permits an aggrieved party to file a civil action. See 20 U.S.C. § 1415(e).

In Pennsylvania, the initial, hearing stage of the IDEA process is termed a "due process hearing." The processing of the Hunters' complaint began with such a hearing. The matter was assigned to Dr. Constance Fox Lyttle; Dr. Lyttle's inquiry into the Hunter grievance consumed nineteen hearing days over the period from October 1991 to September 1992. On February 24, 1993, Dr. Lyttle issued a detailed and lengthy report of her findings and decision. Both sides then invoked the IDEA administrative appeals procedure, which, in Pennsylvania, takes the form of an appeal to the Special Education Due Process Review Panel. On May 21, 1993, the appellate panel issued an opinion that substantially affirmed the hearing officer's findings and decision, with certain modifications.

The following is a summary of the principal elements of the hearing officer's findings and decision, and of those conclusions of the appellate panel which differed from the conclusions of the hearing officer.

1. The Hunters had requested reimbursement for evaluations of Jeremy that they had had performed at their own expense. The hearing officer found that MLSD's multidisciplinary evaluations suffered from a number of major deficiencies, noting, for instance, that MLSD had found that Jeremy had below-normal intelligence on the basis of tests that were not designed for use with children with impaired vision. Accordingly, she ordered that MLSD reimburse the Hunters for evaluations that they had commissioned at their own expense, and that MLSD provide for a number of new evaluations. App. at 17, 40-44, 64.

2. The Hunters asserted that the IEPs prepared by MLSD were vague and inappropriate. The hearing officer agreed. App. at 44-47.

3. The Hunters asserted that MLSD had erred when, during Jeremy's sixth-grade year, it had switched him from a plan under which he received reduced assignments to accommodate his difficulties with reading to a plan under which he received a full assignment load. The hearing officer agreed, and found that MLSD should prepare a new IEP for Jeremy. The parties

had stipulated to a list of persons to be included on a team charged with preparing such an IEP. This list included the Hunters' own vision expert, Jeremy's psychologist, Jeremy's parents, and some MLSD personnel. App. at 39. The hearing officer's decision provided detailed guidelines for the elements of the IEP, App. at 50-52; the appellate decision eliminated some of these provisions, App. at 96-98, leaving these issues to be decided by the future team.

4. The Hunters asked for repayment of the private-school tuition that they had paid. The hearing officer denied this request, on the grounds that the school Jeremy attended was simply a private school, with no special facilities to accommodate his handicap. App. at 52-53.

5. The hearing officer found that MLSD had not provided Jeremy with the "free appropriate public education" guaranteed to him by IDEA. Accordingly, she ordered that MLSD provide compensatory education, in the form of special sessions during the school year and a four-week summer program. App. at 53-54. The appellate panel found that these services should be provided for two years, or until Jeremy graduated from high school. App. at 96.

6. The Hunters sought reimbursement for psychological and vision training that they had paid for while Jeremy attended MLSD public schools. The hearing officer found that the latter services should be reimbursed, but not the former. App. at 55-56.

7. The Hunters sought reimbursement for a wide range of services that they had paid for while Jeremy attended private schools. The hearing officer disallowed some psychological and vision counseling, allowed a vision-related summer program and specialist, allowed expenses for vision-related equipment, and disallowed compensation for the time of Jeremy's parents. App. at 56-60.

The hearing officer also rejected a number of theories under which MLSD sought to contest the Hunters' claims, including a claim that they were barred by the statute of limitations since much of the conduct at issue had occurred many years earlier. App. at 60-62. For reasons that are not made fully clear in the Hunters' complaint, much or all of the foregoing order was never implemented; in particular, no new evaluations were conducted, no new IEP was prepared, and Jeremy's compensatory education never materialized. (The Hunters' complaint refers to MLSD's "failure to allow another agency to assume responsibility for evaluation/programming when requested by the parents," App. at 114, suggesting that this may have been one area of disagreement.) After the appellate decision was issued, Jeremy and his father apparently established residency in Ohio, as a result of which the state of Ohio placed Jeremy at the Ohio State School for the Blind during the 1993-94 school year. This placement, although helpful,

was apparently a lonely one for Jeremy, and in the summer of 1994 he and his father returned to Pennsylvania.

On November 17, 1994, the Hunters filed their complaint in this suit. Their complaint made claims based, on the foregoing events, under IDEA, the Rehabilitation Act, the ADA, and section 1983. In their prayer for relief, they asked that the court:

1. Preliminarily and permanently enjoin Mount Lebanon School District to comply with the requirements of IDEA, ADA and § 504 of the Rehabilitation Act by arranging for free appropriate public education be provided [sic] to Jeremy Hunter by a local educational agency other than Mount Lebanon School District that is capable of undertaking the responsibility to properly evaluate Jeremy Hunter and develop, in cooperation with Jeremy and his parents, an individual education plan and to deliver to Jeremy the education and supplementary services required for him to benefit from his education and achieve his educational potential.

2. Award plaintiff compensatory and punitive damages.

App. at 122.

The defendants then filed a motion to dismiss the Hunters' complaint for failure to state a claim, or, in the alternative, to have the court order a more specific pleading. The motion cited nine grounds for dismissal, one of which was that the Hunters' IDEA claims were barred by the statute of limitations and by failure to exhaust administrative remedies.

On May 30, 1995, in a brief memorandum, the district court dismissed all of the Hunters' claims. The district court began by noting that section 1983 creates no substantive rights, and that the court would therefore focus on the underlying statutory claims. As to the Hunters' IDEA claims, the district court found that a two-year statute of limitations applied. The Hunters' complaint was filed on November 17, 1994; thus, the district court found that the plaintiffs were "entitled to recover only for alleged IDEA violations that occurred after November 17, 1992." Because the only administrative proceeding brought by the Hunters was initiated in October, 1991, the court found that the Hunters had not exhausted their administrative remedies as to post-November 17, 1992 events. Finally, the court found that the Hunters were barred from pursuing their ADA and Rehabilitation Act claims because they had not exhausted the administrative remedies provided by Title VII.

On appeal, the Hunters assert that these findings were error. We have jurisdiction over the Hunters' appeal pursuant to 28 U.S.C. § 1291. Our review of a Rule 12(b)(6) dismissal is plenary. SeeScattergood v. Perelman, 945 F.2d 618, 621 (3d Cir. 1991).

In Part II of this opinion we address the statutory bases of the Hunters' claims. First, we will outline the relevant provisions of IDEA, of the ADA, and of the Rehabilitation Act. Then we will discuss the Hunters' section 1983 claim, which, we conclude, does have substantive content. In Part III of this opinion we address the statute of limitations aspect of the

Hunters' IDEA claims. Finally, in Part IV, we address questions of exhaustion.

## II. THE STATUTORY BASIS OF THE HUNTERS' CLAIMS

A. The Individuals with Disabilities Education Act

As we have already noted, IDEA guarantees that all disabled children in states accepting federal funding for education for the disabled will receive a "free appropriate public education." 20 U.S.C. § 1415(a). IDEA also, as we have indicated, provides a procedure that allows disabled children and their parents to enforce this guarantee.

As the final stage of this enforcement procedure, IDEA permits "any party aggrieved by the findings and decision" of the state appellate procedure to "bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415 (e)(2). IDEA further provides that, in such an action, "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415 (e)(2).

In part, the Hunters' complaint seeks to contest adverse decisions by the state hearing officer and the appellate panel. To the extent that this is the relief that the Hunters seek, their complaint would seem to be properly brought under § 1415(e)(2). However, the Hunters' complaint also apparently seeks in part to enforce elements of the decision of the state administrative process. There may be some question whether this aspect of the complaint can properly be pursued under § 1415(e)(2); but the question is not one we need to resolve in the context of this case, since, as we note hereafter (see infra, typescript at 16–17), section 1983 (42 U.S.C. § 1983) provides an adequate vehicle for a suit to enforce an IDEA administrative decision.

B. The Rehabilitation Act

IDEA sets forth a positive right to a "free appropriate public education." By contrast, section 504 of the Rehabilitation Act, 29 U.S.C § 794, also invoked by the Hunters, is cast in negative terms, barring all federally funded entities (governmental or otherwise) from discriminating on the basis of disability. SeeW.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995). Section 504 states, in relevant part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794 (a).  We noted in Matula that, as this portion of the Rehabilitation Act has been interpreted, "[t]here appear to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition."  67 F.3d at 492-93.  We also found in Matula that both injunctive relief and monetary damages are available under section 504.  See Matula, 67 F.3d at 494.

C.  The Americans with Disabilities Act

The Hunters do not cite a specific provision of the ADA in their complaint.  We will assume, however, that it was their intention to rely upon 42 U.S.C. § 12132, which extends the nondiscrimination rule of section 504 of the Rehabilitation Act to services provided by any "public entity" (without regard to whether the entity is a recipient of federal funds).  See Helen L. v. DiDario, 46 F.3d 325, 331-32 (3d Cir. 1995).  Section 12132 states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall by reason of such disability be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (1995).  Under 42 U.S.C. § 12133, "the remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."  42 U.S.C. § 12133 (1995).  29 U.S.C. § 794a is the provision that governs remedies for violations of section 504 of the Rehabilitation Act.  Because we held in Matula that this provision permitted claims for monetary damages, see 67 F.3d at 494, it follows that those claims are also permitted under the ADA.

D.  Section 1983

Section 1983 provides a civil remedy for acts taken under color of law that deprive "any citizen of the United States or person within the jurisdiction thereof" of "rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  Not infrequently, section 1983 (1) provides redress for violations of federal laws that do not by their own terms create a cause of action, or (2) provides remedies not available directly under those laws.

In the present case, whether or not an IDEA decision of a state hearing officer or appellate body is enforceable under IDEA directly, such a decision would seem to be enforceable under section 1983.  The Fourth Circuit found, in Robinson v. Pinderhughes, 810 F.2d 1270 (4th Cir. 1987), that a section 1983 action could be brought to enforce the decision of an IDEA administrative proceeding.  We agree with the reasoning of Pinderhughes, and note that the Supreme Court's present methodology for ascertaining whether a section 1983 action is available to redress a violation of federal law produces the same result.

## III.  THE STATUTE OF LIMITATIONS

In Tokarcik v. Forest Hills School District, 665 F.2d 443 (3d Cir. 1981), this court found, drawing on Pennsylvania law, that either a two-year or a six-year limitations period applied to the filing of IDEA actions.  We did not then have occasion to decide between these two periods, although we suggested that a two-year period might be appropriate.  See id. at 454-55.

The district court, citing Tokarcik, applied a two-year limitations period to the plaintiffs' IDEA claims.  It stated that the plaintiffs had filed their action on November 17, 1994, and that they therefore could not recover for any alleged IDEA violations that had occurred before November 17, 1992   in other words, for virtually all of the events at issue in their complaint.

We find that the district court's application of the limitations period in this manner was error.  IDEA requires that a plaintiff exhaust state administrative remedies before initiating a civil suit.  In the present case, that process took some eighteen months, from October 1991 to May 1993.  (Indeed, the Hunters apparently first requested a due process hearing in February 1991, over two years before the appellate panel issued its decision in May 1993.)  As it was applied by the district court, the limitations period could, in combination with the exhaustion requirement, operate to deprive a plaintiff of much or all relief under IDEA.

There remains the question   not explicitly answered by Tokarcik   of how the statute of limitations is to be applied.  There would appear to be two principal alternatives: (1) that the period begins when the acts complained of occur (and is tolled while exhaustion occurs), and (2) that the period begins once the state administrative process has run its course.  The first approach has many flaws; for instance, it requires a complex tolling analysis, and allows different plaintiffs widely varying (and perhaps difficult-to-ascertain) periods in which they may bring suit.  It might therefore interfere with the statutory policy   cited by Tokarcik in declining to apply a thirty-day limitations period   of allowing parents ample time to work together with school authorities in evaluating and implementing administrative decisions, and then, if necessary, to prepare an appeal.  SeeTokarcik, 665 F.2d at 451-53 (1981).  Accordingly, we find that the second approach is preferable, that the limitations period for the initiation of the present action therefore only began to run once the appellate panel issued its decision, on May 21, 1993, and that all of the Hunters' claims now before this court were therefore timely brought.

## IV.  EXHAUSTION

IDEA requires, in section 1415(e)(2), that an aggrieved party must invoke a state's administrative procedures before bringing an IDEA claim in state or federal court.  Section 1415(f) of IDEA adds to this the requirement that, before bringing claims under other statutes that "seek[] relief that is also available under this subchapter," the administrative procedures set forth in section 1415 "shall be exhausted to the same extent as would be required had the action been brought under this subchapter."  20

U.S.C. § 1415(f). This provision bars plaintiffs from circumventing IDEA's exhaustion requirement by taking claims that could have been brought under IDEA and repackaging them as claims under some other statute   e.g., section 1983, section 504 of the Rehabilitation Act, or the ADA.  See W.B. v. Matula, 67 F.3d 484 495–96 (3d Cir. 1995) (citing the legislative history of § 1415(f) as stating that "parents alleging violations of section 504 [of the Rehabilitation Act] and 42 U.S.C. 1983 are required to exhaust administrative remedies before commencing separate actions in court where exhaustion would be required under [IDEA].") (quoting H.R. Rep. No. 99–296, 99th Cong., 1st Sess. 7 (1985)); Hope v. Cortines, 69 F.3d 687, 688 (2d Cir. 1995) (holding that exhaustion is required as to ADA claims).

After finding that the statute of limitations barred all of the Hunters' IDEA claims based on events occurring before November 17, 1992, the district court went on to conclude that all of their claims based upon events occurring after that date were barred for failure to comply with IDEA's exhaustion requirement, as the only administrative proceeding that the Hunters had initiated began much earlier, in October 1991.  The district court also, citing Spence v. Straw, 54 F.3d 196, 201 (3d Cir. 1995), held that the plaintiffs were required to exhaust the administrative remedies provided by Title VII of the Civil Rights Act of 1964 before bringing their ADA and Rehabilitation Act claims, and that the plaintiffs' failure to do so barred those claims.  We will begin by considering the latter holding.

A.  Exhaustion under the ADA and Rehabilitation Act.
The exhaustion rule applied in Spence was the result of what we termed an "incongruent enforcement scheme."  54 F.3d 196, 199 (3d Cir. 1995).  The Rehabilitation Act provides two avenues by which a plaintiff may sue to redress employment discrimination. The Act contains a provision, section 501, directed specifically at employment discrimination.  See 29 U.S.C. § 794.  Violations of this provision may be redressed through section 505(a)(1), which permits plaintiffs to invoke "[t]he remedies, procedures and rights" set forth in Title VII of the Civil Rights Act of 1964. See 29 U.S.C. § 794a(a)(1).  Title VII's exhaustion requirement therefore applies to plaintiffs suing under section 501.  The Act also, however, has a general provision, section 504, which bars discrimination against the disabled (including employment discrimination) in all federally–funded programs.  Violations of section 504 may be redressed through section 505(a)(2), which permits plaintiffs to invoke "[t]he remedies, procedures and rights" not of Title VII, but of Title VI, a title which includes no exhaustion requirement.  29 U.S.C. § 794a(a)(2).  Although this structure created the appearance that a plaintiff might be able to circumvent the exhaustion requirement applicable to section 501 through the simple expedient of suing under section 504, in Spencewe found that it was appropriate to conclude that Congress intended to require that a plaintiff bringing an employment discrimination claim under either section 501 or section 504 first exhaust her administrative remedies.  See Spence, 54 F.3d at 199–202.
Spence involved very unusual circumstances, which do not

obtain here.  The provisions of the Rehabilitation Act and of the ADA invoked by the Hunters are not, by the terms of those two statutes, subject to any exhaustion requirements.  Nor do the Hunters' claims have the effect of circumventing some other Congressionally-mandated exhaustion requirement.  Indeed, the only related exhaustion requirement imposed by Congress is IDEA's requirement, in section 1415(f), that a party who brings a claim that seeks relief also available under IDEA must first exhaust IDEA's administrative remedies.  See 20 U.S.C. § 1415(f).  This the Hunters have done with respect to their ADA and Rehabilitation Act claims, by following the elaborate route of a "due process" hearing and review by an appellate panel.  In the absence of any incongruity in the IDEA scheme, there is no need to impose any further exhaustion requirement.

B.  Exhaustion under IDEA

As we have just pointed out, the Hunters have, with respect to their ADA and Rehabilitation Act claims, exhausted IDEA's administrative remedies.  But the Hunters have also advanced two other groups of claims which call for a somewhat more extended exhaustion analysis.  These are: (1) their effort to enforce the decision of the state administrative process, and (2) what appears to be an effort to raise claims that they did not raise in the state administrative process.

1.  Efforts to enforce the decision of the state proceeding.  The defendants argue that the Hunters' effort to enforce the decision of the state administrative proceeding is subject to a specialized exhaustion requirement.  They assert that claims of this type must be exhausted through a "Complaint Management System" established by Pennsylvania's Bureau of Special Education, an administrative procedure distinct from the "due process hearing" procedure discussed above.

The defendants have furnished the court with a general description of this "Complaint Management System," but with no documentation as to its specific elements or legal basis.  The defendants' description suffices, however, to persuade us that the system to which they refer is the system established by the Commonwealth of Pennsylvania to implement a set of federal regulations that require that state educational agencies establish procedures for receiving and resolving complaints relating to IDEA implementation.  See 34 C.F.R. §§ 300.660-300.662.  These regulations establish minimum procedures that state agencies must follow in resolving complaints, requiring, for instance, that agencies carry out an investigation and issue a written decision containing findings of fact, conclusions, and, if necessary, corrective actions to achieve compliance.  See 34 C.F.R. § 300.661.  Complainants are also provided the right to appeal adverse decisions to the Secretary of the United States Department of Education.  See 34 C.F.R. § 300.661.

The Ninth Circuit, in Hoeft v. Tucson Unified School Dist., 967 F.2d 1298 (9th Cir. 1992), suggested in dicta that a plaintiff could, as to certain types of claims, be required to exhaust the Education Department General Administrative Regulations (or EDGAR)

procedures, a regulatory forerunner of the present sections 300.660–300.662. See Hoeft, 967 F.2d at 1307–08. The Hoeft court noted that this process might serve as an alternative exhaustion mechanism to IDEA's own administrative procedures in certain cases, concluding that "[w]hether to require or to accept exhaustion of the EDGAR procedure as a substitute for exhausting IDEA procedures in challenges to facially invalid policies, however, is a determination which must be made on a case–by–case basis." 967 F.2d at 1308. Hoeft did not, however, cite any legal authority, either in the EDGAR regulations or in the text of IDEA, under which a court might require exhaustion of EDGAR procedures. Nor can we discern any such authority, either as to the previous EDGAR procedures or as to the present §§ 300.660–300.662. Indeed, the text of §§ 300.660–300.662, and the various statements made in the Federal Register as they took their present shape, both evince an expectation that invocation of the complaint procedures they establish will be elective, not mandatory.

2. Claims not raised in the state proceeding. As to events that occurred after the conclusion of the state administrative proceeding, the Hunters have, of course, had no opportunity to exhaust their administrative remedies. For this reason, the district court dismissed all of the Hunters' claims based on such events. The district court also stated that it was "not persuaded by plaintiffs' conclusionary averment that their pursuit of administrative remedies would be a futile gesture." The Hunters appeal this ruling.

The district court did not provide a detailed listing of which elements of the Hunters' complaint it was dismissing on this ground. However, an examination of the complaint reveals that the only event which it describes that occurred after the termination of the administrative proceeding was Eugene and Jeremy Hunter's temporary move to Ohio in order to enroll Jeremy in a public school for the disabled. This claim raises a number of important policy questions, such as when it is appropriate for a state to pay the costs of moving one of its citizens to another state in order to receive public benefits there. We therefore agree with the district court that this claim should be exhausted.

Finally, it appears that one element of the Hunters' complaint, the Hunters' request that MLSD not be involved in evaluations or programming for Jeremy, was not raised in the state proceeding. The state appellate panel specifically rejected a request by the Hunters that MLSD not perform evaluation and programming, on the ground that this issue had not been raised before the hearing officer. App. at 99. Assuming that the appellate panel's finding was correct, we find that it would be appropriate for this claim to be exhausted before it is examined in the district court.

We reach this conclusion with some reluctance, as it could entail further delay in an already much–delayed case. However, the issue of MLSD's involvement in evaluation and programming for Jeremy seems to be central to the Hunters' complaint. Accordingly, the administrative process should be allowed an opportunity to address that central issue. A principal purpose of IDEA's

administrative procedure is to permit "state and local education agencies[,] in cooperation with the parents or guardian of the child," to take "primary responsibility for formulating the education to be accorded a handicapped child," Board of Education v. Rowley, 458 U.S. 176, 207 (1982); thus, we find that it is appropriate to permit the Commonwealth to address this issue before it is considered in the district court. We also note that the IDEA hearing and appeal process currently includes strict time limits, and that the entire exhaustion process should take no longer than a few months if these limits are observed. See 34 C.F.R. § 300.512 (1995).

## V.   CONCLUSION

In conclusion, then, we find that:

(1) The Hunters' section 1983 claim does have substantive content, as it can form the basis of a claim for damages, and as section 1983 is an instrument by which the Hunters may compel MLSD to comply with a decision of the state administrative process.

(2) Because the IDEA statute of limitations does not begin to run until the termination of the state administrative proceedings, the Hunters' IDEA claims were timely brought.

(3) The Hunters need not exhaust Title VII administrative remedies as to their ADA or Rehabilitation Act claims.

(4) The Hunters need not exhaust the Commonwealth of Pennsylvania's "Complaint Management System."

(5) The Hunters must exhaust their claims based upon Eugene and Jeremy Hunter's move to Ohio.

(6) Assuming that the Hunters did not raise their claims relating to the involvement of MLSD in Jeremy's evaluation and programming in the state administrative proceedings, they must exhaust those claims before they may raise them in the district court.

We will therefore reverse the district court's order dismissing the Hunters' complaint, and remand for proceedings consistent with this opinion.