United States Court of Appeals
For the First Circuit


No. 98-1978

JOSEPH LYDON,

Plaintiff, Appellant,

v.

BOSTON SAND & GRAVEL COMPANY,

Defendant, Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]



Before

Selya and Stahl, Circuit Judges,

and Shadur, Senior District Judge.



James T. Masteralexis for appellant.
Robert P. Corcoran, with whom Gleeson & Corcoran was on brief,
for appellee.



April 9, 1999
SHADUR, Senior District Judge. This labor dispute
presents a collision at the intersection of judicial doctrines that
in this instance would operate at cross-purposes: on the one hand
the doctrine of complete federal preemption, and on the other hand
both the limitations on that doctrine and the independent principle
of judicial estoppel. Appellant Joseph Lydon ("Lydon") has sought
to resolve his quarrel with his employer, appellee Boston Sand and
Gravel Co. ("Boston Sand"), in two successive forums: first by an
attempted arbitration between Lydon's union and Boston Sand
pursuant to their collective bargaining agreement ("CBA"), and then
by Lydon's lawsuit in a Massachusetts state court pursuant to that
state's workers' compensation laws. 
When Lydon initially filed his grievance under the CBA,
leading in turn to the union's invocation of the arbitration
remedy, Boston Sand successfully argued before the arbitrator that
the parties had already agreed his claims should instead be decided
under state statutes. When Lydon then did file suit in a state
court, Boston Sand removed the case to federal court, urging that
Lydon's state law claims were preempted by federal labor laws.
Finding that the state law claims were indeed preempted,
the district court entered a summary judgment of dismissal in favor
of Boston Sand. For the reasons stated in this opinion, we hold
that while Lydon's claims might ordinarily be preempted, they are
not preempted here because of Boston Sand's prior litigating
position. We therefore remand this case to the district court with
a direction that it be remanded to the state court of origin.
Facts
Boston Sand hired Lydon as a cement truck driver in 1984. 
In July 1991 Lydon suffered a work-related neck injury that
prevented him from working. He received weekly workers'
compensation payments until May 1993, when he settled his claim and
received a lump sum payment that was projected to cover four years
of weekly payments based on Lydon's expected period of disability.
During those four years Lydon was presumed as a matter of
Massachusetts law (Mass. Gen. L. ch. 152, 148) to be unable to
work. Nonetheless Lydon did some driving for another concrete
company, Sherman Concrete, from fall 1993 to spring 1995.
In April 1995 Lydon attempted to return to work for
Boston Sand. After a physician determined that he was physically
able to do so, Lydon met with Vice President David McNeil
("McNeil") and attempted to substantiate his physical ability to
return to work by noting his interim job with Sherman Concrete. 
McNeil informed Lydon that because he had worked for another
company for a year and a half, Boston Sand considered Lydon to have
quit his job and forfeited his seniority rights. Lydon's union,
Teamsters Local 379, then presented a written request for Lydon's
reinstatement, which Boston Sand denied.
That request led to an exchange of letters between the
union's attorneys and Boston Sand's attorneys. In December 1995
union attorney Paul Kelly ("Kelly") wrote to Boston Sand attorney
Robert Corcoran ("Corcoran") that a worker who received a lump sum
settlement and was absent from work because of the state statutory
presumption of incapacity, but who then wished to return to work,
had no remedy under the CBA and that such a claim can arise only
under statutory law. Corcoran responded the following month by
agreeing with Kelly's assessment but taking it a step further,
stating:
It is Boston Sand's position that an
injured worker claiming a right of
reinstatement following a lump sum
settlement can assert such a claim only in
court under the statute, and not as a
grievance under the contract.

Kelly confirmed a few weeks later by writing back that the union
was in agreement that "the reinstatement rights of workers who
enter into lump sum agreements are not covered by the collective
bargaining agreement and, as such, must be asserted in judicial
proceedings."
After the May 1997 expiration of the four-year statutory
presumption of Lydon's incapacity to work, his private attorney
threatened to sue Boston Sand under the state workers' compensation
statute. That threat led to negotiations that resulted in Lydon's
returning to work on August 11, 1997, but with seniority preference
only over those hired in or after July 1997. That minimal
preference left Lydon significantly farther down on the seniority
list--with an accompanying loss of benefits--than he would have
been if he had been reinstated with the seniority rights of his
original 1984 date of hire.
On August 17, 1997 the union filed a grievance against
Boston Sand, claiming that its refusal to grant Lydon seniority
based on his 1984 date of hire violated the CBA. That grievance
proceeded to arbitration, where the arbitrator held that the
dispute was not arbitrable because the parties had previously
agreed (in the already-described 1995-96 exchange of letters) that
reinstatement rights, which the arbitrator determined included both
rehiring and seniority, were not covered by the CBA and could be
enforced only under state statutes. In the face of the explicit
references to "reinstatement rights" in the letters, the arbitrator
rejected Lydon's argument that the 1995-96 agreement covered only
rehiring and not seniority. Further, the arbitrator agreed
substantively with the parties' exchange of letters in finding that
the CBA did not at all address the rights of workers who received
lump sump settlements, so that it could not be considered
inconsistent with the state statute.
Lydon then filed a civil suit in Massachusetts state
court, claiming that Boston Sand violated Mass. Gen. L. ch. 152,
75A and 75B because it discriminated against him by failing to
reinstate his original seniority rights when he started back to
work. As stated earlier, Boston Sand removed the suit to federal
court on the predicate that the state law claims were preempted by
Section 301 of the Labor Management Relations Act, 29 U.S.C. 185
("Section 301").
Lydon's appeal disputes the district court's entry of 
summary judgment in favor of Boston Sand on that ground. As
always, our review of the district court's award of summary
judgment is de novo (Wightman v. Springfield Terminal Ry., 100 F.3d
228, 230 (1st Cir. 1996)).
Preemption Doctrine
Certain aspects of federal labor law have long been
construed to preempt the field--they not only provide for federal
jurisdiction over contract disputes but also prohibit certain state
law actions in the same subject area. In the labor law context,
the statutory foundation for such complete preemption is found in
Section 301(a):
Suits for violation of contracts between
an employer and a labor organization
representing employees in an industry
affecting commerce as defined in this
chapter . . . may be brought in any
district court of the United States having
jurisdiction of the parties, without
respect to the amount in controversy or
without regard to the citizenship of the
parties.

From those simple words, a complex preemption
jurisprudence has grown in stages. Initially state courts were
simply prevented from applying local rather than federal law in
deciding contract disputes about CBAs (see Teamsters Local 174 v. Lucas Flour Co., 369 U.S. 95 (1962)), but then the doctrine was
extended to preempt state law remedies whenever resolution of a
plaintiff's claim is substantially dependent on analysis of a CBA's
terms (Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1985)). Such
preemption is necessary, according to the Supreme Court, to retain
consistency in the interpretation of terms common to CBAs and to
prevent parties from relabeling as state law claims their actions
that in actuality arise under a CBA (see, e.g., Livadas v. Bradshaw, 512 U.S. 107, 122-23 (1994)).
Nonetheless the doctrine does not preclude all state law
claims that are somehow linked to a labor dispute. Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-06 (1988)
(emphasis added) states the test for determining whether a
particular state remedy has been preempted by federal law:
[I]f the resolution of a state-law claim
depends upon the meaning of a collective-
bargaining agreement, the application of
state law (which might lead to
inconsistent results since there could be
as many state-law principles as there are
States) is pre-empted and federal labor-
law principles--necessarily uniform
throughout the Nation--must be employed to
resolve the dispute.

Mere parallelism between a state law claim and a federal contract
claim does not necessarily require state court interpretation of
the CBA--that is, as long as the state claim can be resolved
without construing the agreement itself, it is not preempted by
Section 301 (id. at 409-10). Furthermore, "the bare fact that a
collective-bargaining agreement will be consulted in the course of
state-law litigation plainly does not require the claim to be
extinguished" (Livadas, 512 U.S. at 124, citing and thereafter
quoting from Lingle, 486 U.S. at 413 n.12). 
Courts confronted with state law claims must therefore
locate the line between the need for mere consultation of a CBA,
which does not demand federal preemption, and more active
interpretation of that agreement, which does preempt the state law
claims. As we have said of that dichotomy, "[o]ur premise is that
this means a real interpretive dispute" (Martin v. Shaw's
Supermarkets, Inc., 105 F.3d 40, 42 (1st Cir. 1997)(emphasis in
original)). Our task here, then, is to determine the extent to
which the analysis of Lydon's state causes of action under Sections
75A and 75B is dependent on the CBA.
We have twice before addressed the preemptive effect of
federal labor law over those same state provisions. In Martin, 105
F.3d at 44 we found both Sections 75A and 75B preempted by federal
labor law, and in Magerer v. John Sexton & Co., 912 F.2d 525, 529-
30 (1st Cir. 1990) we found Section 75B preempted. Both cases
found the claims preempted because of a proviso present in each
statutory section:
In the event that any right set forth in
this section is inconsistent with an
applicable collective bargaining
agreement, such agreement will prevail.

Martin, 105 F.3d at 44 and Magerer, 912 F.2d at 529
reasoned that the quoted provision required courts to interpret the
relevant CBA to determine whether it was inconsistent with the
state statute. So even if the state cause of action did not itself
require the court to construe the CBA, the inconsistency clauses of
the state statutes would require such interpretation. Thus, for
example, Martin's state claims were held preempted "not because the
collective bargaining agreement is inconsistent with the state
claims asserted, but because it may be so and requires
interpretation" (Martin, 105 F.3d at 44 (emphasis in original)). 
Martin recognized that its analysis would result in preemption of
Section 75A and 75B claims in some troubling cases that would not
otherwise be precluded (id.). But it went on to observe that
either the legislature or the unions could avoid that problem by
modifying the statutes or the CBAs (id.)--neither of which occurred
in this case. Accordingly, Boston Sand urges this Court to follow
the rationale of Martin and Magerer and to find Lydon's claims
preempted as well.
Matters are not so easy as Boston Sand would have it, for
this case presents an interesting twist to the preemption analysis: 
Here the arbitrator chosen by the parties has already held--
pointing expressly to Boston Sand's attorney Corcoran's letter
taking that position--that the parties had agreed in 1995-96 that
the CBA did not apply to (indeed, did not even attempt to address)
Lydon's claims. Furthermore, the arbitrator (on whom the parties
have conferred the authority to interpret the CBA) found that
because the CBA did not purport to cover reinstatement of workers
who received lump sum settlements for a workers' compensation
claim, the CBA and the statute could not be inconsistent.
With that conclusion having been arrived at pursuant to
the parties' agreement, neither the district court nor we have any
occasion to interpret the CBA or the parties' 1995-96 letter-based
agreement to determine the already-resolved question of whether the
state statutory remedies are consistent or inconsistent with those
provided in the CBA. That determination has already been made--
first by the parties, then by the arbitrator. Neither Martin nor
Magerer requires us to find Lydon's claims preempted.
Boston Sand further argues, however, that the substance
of Lydon's discrimination claims would require more than mere
reference to the CBA. It argues that resolution of the state law
claims would require both reliance on a duty created by the CBA 
and interpretation of the CBA's seniority provisions. In an effort
to support that contention, Boston Sand cites Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir. 1997):
A state-law claim can "depend" on the
"meaning" of a collective bargaining
agreement in two ways. First, a claim so
qualifies if it alleges conduct that
arguably constitutes a breach of a duty
that arises pursuant to a collective
bargaining agreement. See United
Steelworkers v. Rawson, 495 U.S. 362, 369
(1990)("[A] state-law tort action against
an employer may be pre-empted by 301 if
the duty to the employee of which the tort
is a violation is created by a
collective-bargaining agreement and
without existence independent of the
agreement."). Second, a claim so
qualifies if its resolution arguably
hinges upon an interpretation of the
collective bargaining agreement. SeeAllis-Chalmers Corp. v. Lueck, 471 U.S.
202, 220 (1985)(finding section 301
preemption "when resolution of a state-law
claim is substantially dependent upon
analysis of the term of an agreement made
between the parties in a labor contract"). 
If a state-law claim depends on the
meaning of the collective bargaining
agreement in either of these ways--that
is, under Rawson's "duty" rubric or under
Allis-Chalmers's "interpretation"
rubric--it is preempted.

Boston Sand's position seeks to draw force from the first
of those alternatives and the notion that seniority rights
typically stem from a CBA. But again the situation before us
differs materially from that norm, because Boston Sand has
previously agreed with the union as Lydon's representative that the
CBA did not address the statutory workers' compensation issues--
that only the state statute does that and defines Lydon's rights--
and because the arbitrator found that agreement (including the
consequent rights that define Lydon's place in the workforce)
binding.
Indeed, the parties' express agreement that the CBA does
not cover their dispute operates here just as any stipulation about
any other legal issue in a case would. For example, had the
parties stipulated in 1995 to a definition of seniority rights
without reference to the preexisting CBA, that stipulation would
continue to bind them at this stage of the proceedings. Neither
party could now attempt to rely on a different definition of the
term. In the same way, both sides here have agreed that the CBA
did not even address the issues at stake between them. Just so,
one party--Boston Sand--cannot now renege on its agreement in an
effort to avoid answering the other's state law claims.
We therefore reject the notion that Lydon's claims are
preempted by Section 301. Indeed, that outcome is fortified
(independently, in a way) by a concept that has already been
implicated somewhat in our analysis and that we will now discuss in
more detail: the doctrine of judicial estoppel.
Judicial Estoppel
Judicial estoppel "precludes a party from asserting a
position in one legal proceeding which is contrary to a position it
has already asserted in another" (Patriot Cinemas, Inc. v. General
Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987)). That doctrine's
dual goals are to maintain the integrity of the judicial system and
to protect parties from opponents' unfair strategies (id. at 214). 
Indeed, "[i]f parties feel free to select contradictory positions
before different tribunals to suit their ends, the integrity and
efficacy of the courts will suffer" (id.). According to Patriot
Cinemas, id. at 212 (internal quotation marks and citations
omitted), the doctrine "should be employed when a litigant is
playing fast and loose with the courts, and when intentional self-
contradiction is being used as a means of obtaining unfair
advantage." Although the doctrine varies somewhat among states and
among federal circuits (18 James W. Moore et al. (Lawrence B.
Solum, ed.), Moore's Federal Practice 134.30, at 134-62 to -63
(3d ed. 1998)), our application of the doctrine requires that the
party being estopped have succeeded previously with a position
directly inconsistent with the one it currently espouses (see Gensv. RTC, 112 F.3d 569, 572 (1st Cir. 1997), quoting Patriot Cinemas,
834 F.2d at 212; see also Casas Office Mach., Inc. v. Mita Copystar
Am., Inc., 42 F.3d 668, 676 (1st Cir. 1994)).
Lydon urges that judicial estoppel principles should
prevent Boston Sand from arguing here that federal law is Lydon's
exclusive remedy. As he points out, at the arbitration proceeding
Boston Sand succeeded with precisely the opposite argument--that
the parties had already agreed that state law provided Lydon's
exclusive remedy and that the CBA did not address the issue. 
Boston Sand's inconsistency is both patently unfair to
Lydon and destructive to the integrity of the judicial system. 
Boston Sand should not be allowed to argue successfully in each of
two potential forums that Lydon's claims should be heard in the
other, thereby depriving Lydon of any tribunal in which to bring
his action. Not only does that strategy place Lydon at an unfair
disadvantage and force him to embrace inconsistent arguments, but
also it erodes the credibility of the court system and the efficacy
of private arbitration agreements. If parties are allowed to argue
one position to get out of arbitration and then to argue the exact
opposite to avoid related court battles, the value of arbitrators
as decisionmakers (a value that has repeatedly been stressed by the
Supreme Court, particularly in the context of labor matters) will
be vitiated.
Here Lydon filed his suit in state court in direct
reliance on Boston Sand's assertions--both in the 1995-96 exchange
of letters and in its arguments before the arbitrator--that it
viewed the state court as the appropriate forum for the dispute. 
We therefore also draw upon the judicial estoppel doctrine in
holding that Boston Sand cannot be permitted to circumvent its
earlier agreement with Lydon that the existing dispute should be
resolved in the state courts under the state statutes (while we
express no substantive view, of course, on the merits of the state 
law claims). That doctrine operates, independently of the earlier
discussion in this opinion, to hold Boston Sand to its own and the
arbitrator's conclusions that Lydon must present his claims in
state court and that the CBA does not purport to cover the disputed
issue.
Subject Matter Jurisdiction
We recognize that there is something troubling about the
conclusion that we have announced. After all, if it had not been
for the parties' 1995-96 agreement and the ensuing arbitration
decision confirming that agreement, the traditional Lingle analysis
would most likely have triggered federal preemption of Lydon's
claims. That is so because the merits of Lydon's state claims
could otherwise have required interpretation of the CBA. For
example, assessing whether Lydon faced adverse employment
action--one of the necessary elements of his discrimination claim
(see MacCormack v. Boston Edison Co., 423 Mass. 652, 662, 672
N.E.2d 1, 7 (1996))--might well have required interpretation of the
CBA to determine whether Boston Sand had a duty to grant Lydon the
benefit of his original seniority.
If in other circumstances the Lingle line of cases could
thus lead to preemption of Lydon's claims, the question is whether
the parties should be able in a sense to contract out of federal
jurisdiction by agreeing that the CBA is not implicated in the
case. This is not a situation involving state-federal concurrent
jurisdiction, where parties often forgo potential federal
jurisdiction by the plaintiff choosing to sue in a state court and
by the defendant simply not removing the case to a federal court. 
By contrast, in the field occupied by Section 301 (broadly
construed), Congress and the Supreme Court have determined that the
federal courts should have exclusive jurisdiction. Not only have
they conferred jurisdiction over such claims on the federal courts,
but they have also prohibited state courts from hearing them. 
Indeed, for that very reason courts have been cautioned to give
careful consideration to the application of judicial estoppel when
subject matter jurisdiction is at stake (18 Charles Alan Wright et
al., Federal Practice and Procedure: Jurisdiction 4477, at 784
(1981 & 1998 supp.)).
But those concerns do not apply here. What the parties
agreed to in prior proceedings--and what the arbitrator relied on
in coming to his decision that the dispute was not arbitrable--was
that the CBA simply did not address the seniority rights of workers
returning to work after lump sum workers' compensation settlements. 
Thus the parties agreed (and the arbitrator held) that there would
be no need for a state court to interpret the CBA, because it would
find nothing relevant to interpret in that agreement. Or to phrase
the matter a bit differently, it is the Massachusetts statutes and
not the CBA that have been agreed by the parties to define Lydon's
rights of priority vis-a-vis other employees.
In fact, any determination that would question the result
here on subject matter jurisdictional grounds would be at odds with
circuit precedent. In Sweeney v. Westvaco Co., 926 F.2d 29, 37-41
(1st Cir. 1991) we determined "that LMRA 301 preemption . . .
concerns what law a decision maker must apply, not what forum must
decide the dispute" (id. at 39, emphasis in original), so that the
preemption doctrine did not impose a limitation on federal courts'
subject matter jurisdiction. If as we held in Sweeney Section 301
preemption is a waivable defense, it really follows a fortiori that
a litigant such as Boston Sand, which has not merely failed to
assert (that is, has not simply waived) the issue but has actively
(and successfully) advanced a position taking the issue out of the
ambit of Section 301, could not now contest subject matter
jurisdiction here.
Simply put, Lydon is not stripped of his capacity to
bring his claims in state court by Section 301 preemption, because
it has been definitively established as between the parties that
there is no need to interpret the CBA to assess those claims. That
is what the parties have agreed to, that is what the arbitrator
found, and that is what we rely on in finding there is no Section
301 preemption.
Conclusion
We remand this case to the district court with directions
to remand the case to the Superior Court of Massachusetts, Suffolk
County. It is so ordered. In so doing, we express no views on the
substantive merits of Lydon's claims.