OPINION
On February 21, 1997, William Stephenson filed a complaint in the Franklin County Court of Common Pleas against Yellow Freight Systems, Inc. ("Yellow Freight"), James McDonald, Yellow Freight's Distribution Center Manager, Jeffrey Lilly, Yellow Freight's Ohio Terminal Operations Manager, and John and Jane Doe, unknown employees of Yellow Freight. Mr. Stephenson set forth four claims for relief: wrongful discharge, defamation, wrongful termination of benefits in violation of public policy and bad faith intentional termination of rehabilitation wage loss benefits. This appeal involves only two of these claims, wrongful discharge and defamation.
In his complaint, Mr. Stephenson averred the following as to his wrongful discharge claim. Mr. Stephenson had been employed by Yellow Freight as a truck driver and in 1993, he suffered an on-the-job injury. Mr. Stephenson filed a workers' compensation claim. As a result of the injury, Mr. Stephenson was unable to return to work as a truck driver and was reassigned to a position that paid substantially less than his former position. Therefore, Mr. Stephenson filed for and began receiving living maintenance wage loss payments which paid two-thirds of the income he lost due to the change in duties. On October 5, 1995, the Ohio Bureau of Workers' Compensation ("BWC") authorized Mr. Stephenson to receive rehabilitation wage loss benefits for six months. Mr. Stephenson had left work in September 1995 on a personal leave of absence. Mr. Stephenson continued to receive rehabilitation wage loss benefits from October 1995 through November 1995.
Mr. Stephenson further averred that on December 15, 1995, Mr. Lilly, conspiring with Mr. McDonald and the other individual defendants, terminated him for allegedly receiving workers' compensation benefits while actually working. On December 29, 1995, Mr. Lilly wrote Mr. Stephenson a letter stating Mr. Stephenson was terminated for falsifying information on his employment application ten years earlier. Mr. Stephenson averred that the reasons given for his discharge were mere pretext and that his discharge was in retaliation for having applied for and received living maintenance wage loss and rehabilitation wage loss payments under workers' compensation statutes. Further, Mr. Stephenson averred that his discharge was in retaliation for having informed co-workers of the availability of such benefits and how to obtain them.
Mr. Stephenson stated in his complaint that such action by the defendants was in violation of public policy found in Article I, Section 2 and Article II, Section 35 of the Ohio Constitution, R.C. 4121.63 and R.C. 4121.67(B). Further, Mr. Stephenson averred the defendants acted knowingly and intentionally and with malice or reckless indifference to his rights. As a result, Mr. Stephenson allegedly suffered and will suffer from emotional distress and anguish and loss of income, health, welfare and pension benefits.
As to his defamation claim, Mr. Stephenson averred that the defendants, in contacting the BWC and in seeking to have him investigated, published a false statement concerning his alleged fraudulent receipt of benefits.
Yellow Freight filed a motion to dismiss Mr. Stephenson's claim for wrongful discharge contending that as a matter of law, such claim failed because Mr. Stephenson failed to comply with R.C. 4123.90. Further, Yellow Freight argued that a cause of action for wrongful discharge in violation of public policy as set forth in Greeley v. Miami Valley Maintenance Contrs., Inc. (1990), 49 Ohio St.3d 228 could only be brought by at-will employees and that as a union member under a collective bargaining agreement, Mr. Stephenson was not an at-will employee. Mr. Stephenson filed a memorandum contra asserting, in part, that his claim for wrongful discharge did not arise under Greeley but was pursuant to the Supreme Court's decision in Balyint v. Arkansas Best Freight System, Inc. (1985), 18 Ohio St.3d 126.
On January 15, 1998, Mr. Stephenson voluntarily dismissed Mr. Lilly and Mr. McDonald from the defamation claim. On February 27, 1998, the defendants filed a motion for summary judgment as to all claims. As to the wrongful discharge claim, the defendants made essentially the same arguments as were made in the motion to dismiss. As to the defamation claim, the defendants contended the alleged defamatory statements were privileged and that there was no evidence to show the statements were made with actual malice. Mr. Stephenson filed a memorandum contra. As to the wrongful discharge claim, Mr. Stephenson referred to the arguments set forth in his memorandum contra the motion to dismiss.
On March 17, 1998, the trial court rendered a decision granting the motion to dismiss as to the claims remaining against Mr. Lilly and Mr. McDonald and denying the motion as to Yellow Freight. As such, the only claims remaining were against Yellow Freight.[1]
On October 7, 1998, the trial court rendered a decision on Yellow Freight's motion for summary judgment. As to the wrongful discharge claim, the trial court found that Mr. Stephenson could not maintain a Greeley cause of action because he was not an at-will employee, that even if Mr. Stephenson could maintain a Greeley cause of action, he failed to comply with the time requirements in R.C. 4123.90 and that the holding in Balyint did not apply to Mr. Stephenson's claim for wrongful discharge. As to the defamation claim, the trial court found no genuine issue of fact, and Mr. Stephenson could not show by clear and convincing evidence that statements made to the BWC were made with actual malice. Therefore, the trial court granted summary judgment in favor of Yellow Freight on the wrongful discharge and defamation claims. The trial court also granted summary judgment in favor of Yellow Freight on the claim of wrongful termination of benefits. On December 21, 1998, the trial court granted summary judgment in favor of Yellow Freight on the remaining claim, bad faith termination of rehabilitation wage loss benefits. A final judgment entry was journalized on January 5, 1999.
Mr. Stephenson (hereinafter "appellant") has appealed to this court, assigning the following errors for our consideration:
 1) THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT ON THE FIRST CLAIM FOR WRONGFUL TERMINATION.
 2) THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE APPELLEE YELLOW FREIGHT SYSTEM, INC., ON THE SECOND CLAIM, FOR DEFA-MATION.
Yellow Freight (hereinafter "appellee") has filed a cross-appeal, assigning the following errors in the event this court reverses the trial court's granting of summary judgment:
 1. The trial court erred in denying Yellow Freight's motion to strike Cross-Appellee's exhibits.
 2. The trial court erred in granting Cross-Appellee's motion for order compelling Cross-Appellant's Yellow Freight Systems, Inc., to remove redaction of information on reserves set for workers' compensation claim.
In his first assignment of error, appellant contends the trial court erred in granting summary judgment in favor of appellee on the wrongful discharge claim. Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. Zivich v. Mentor Soccer Club, Inc. (1998), 82 Ohio St.3d 367, 360-370, citing Horton v. Harwick Chem. Corp. (1995), 73 Ohio St.3d 679, paragraph three of the syllabus. Our review of the appropriateness of summary judgment is de novo. See Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35.
Appellant's first assignment of error involves a question of law. As indicated above, the trial court granted summary judgment in favor of appellee, in part, because it found Balyint did not apply to appellant's claim for wrongful discharge. Appellant contends that the decision in Balyint does apply to the case at bar. In Balyint, an employee brought suit against his employer alleging the employer negligently, recklessly, willfully and arbitrarily terminated the employee's temporary total disability payments. The employer moved to dismiss the complaint on the grounds the employee failed to comply with R.C. 4123.90. Id. at 127. R.C. 4123.90 states, in pertinent part:
 No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer. Any such employee may file an action in the common pleas court of the county of such employment in which the relief which may be granted shall be limited to reinstatement with back pay, if the action is based upon discharge, or an award for wages lost if based upon demotion, reassignment, or punitive action taken, offset by earnings subsequent to discharge, demotion, reassignment, or punitive action taken, and payments received pursuant to section 4123.56
and Chapter 4141. of the Revised Code plus reasonable attorney fees. The action shall be forever barred unless filed within one hundred eighty days immediately following the discharge, demotion, reassignment, or punitive action taken, and no action may be instituted or maintained unless the employer has received written notice of a claimed violation of this paragraph within the ninety days immediately following the discharge, demotion, reassignment, or punitive action taken.
The Supreme Court concluded that R.C. 4123.90 was not an exclusive remedy and that the employee could select the remedy best calculated to afford the greatest recovery. Balyint at 129-130. One other such remedy was an intentional tort action. Id. at 129. The Supreme Court defined intentional tort as "'* * * an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur.'" Id. at 128, quoting Jones v. VIP Development Co. (1984),15 Ohio St.3d 90, paragraph one of the syllabus. As to an employee's ability to maintain a suit for an intentional tort against his or her employer, the Supreme Court cited Blankenship v. Cincinnati Milacron Chemicals (1982), 69 Ohio St.2d 608, syllabus, wherein the court held that an employee is not precluded by Section 35, Article II of the Ohio Constitution, R.C. 4123.74
or R.C. 4123.741 from enforcing the employee's common law remedies against the employer for an intentional tort.[2] Balyint at 128-129. Again, the remedy in R.C. 4123.90 was not an exclusive remedy. Id. at 129. In so concluding, the Supreme Court noted that the employer could not possibly argue that prior to the enactment of R.C. 4123.90, an employer had a virtual license to take punitive action against an employee for pursuing a workers' compensation claim. Id. at 130.
Under this setting, the Supreme Court held that an employee of a self-insured employer may maintain a cause of action against the employer for the intentional and wrongful termination of workers' compensation payments. Id. at syllabus. Appellant contends that the rationale set forth in Balyint applies to the case at bar and that he has an intentional tort claim against appellee for terminating him in retaliation for filing workers' compensation claims. Appellee contends Balyint is limited to its facts. Appellant asserts it would be absurd to conclude that under the rationale in Balyint, an employee has an intentional tort claim against an employer for wrongful termination of benefits but not for the more egregious act of discharging the employee for filing for workers' compensation benefits. While at first blush appellant's argument seems reasonable, it ignores the long line of cases that address the specific act alleged here wrongful discharge.
Traditionally, an employer could terminate an employee-at-will for any reason. Painter v. Graley (1994),70 Ohio St.3d 377, 382. However, in Greeley, the Supreme Court created an exception to the employment-at-will doctrine and recognized a cause of action in tort for wrongful discharge in violation of public policy. Greeley at paragraph three of the syllabus. In order for an employee to bring a cause of action pursuant to Greeley, however, such employee must be an at-will employee. Haynes v. Zoological Soc. Of Cincinnati (1995),73 Ohio St.3d 254, syllabus. Appellant was not an employee-at-will; rather, appellant was employed pursuant to a collective bargaining agreement. As such, appellant may not bring a Greeley cause of action. See Haynes at 257.
It is important to note that in Balyint, the Supreme Court emphasized that the remedy in R.C. 4123.90 was simply a statutory remedy to enforce an existing right. Balyint at 130. However, a common law tort for wrongful discharge does not exist absent a Greeley public policy exception. In Tulloh v. Goodyear Atomic Corp. (1992), 62 Ohio St.3d 541, syllabus, the Supreme Court held that absent statutory authority, there is no common law basis in tort for a wrongful discharge claim. The syllabus in Tulloh was overruled in Painter at paragraph three of the syllabus. However, the basis for such was that the syllabus in Tulloh erroneously limited cases of wrongful discharge in violation of public policy to those arising out of statutes. Painter at 382. Painter recognized that under the public policy exception to the employment-at-will doctrine, such public policy may be based on sources other than statutory enactments such as the Ohio Constitution, administrative rules and the common law. Id. at paragraph three of the syllabus. Hence, while it did overrule the syllabus in Tulloh, Painter cannot be read to have overruled or to have somehow abrogated the general principle that there is no common law tort for wrongful discharge. See Kulch v. Structural Fibers, Inc. (1997), 78 Ohio St.3d 134, 150.
Because, as a general matter, there is no common law tort of wrongful discharge, this court will not extend the holding in Balyint to find there is a common law cause of action in intentional tort for wrongful discharge in retaliation for filing workers' compensation claims. We note that other courts have also limited Balyint to its facts. See Hyatt v. Neaton Auto Products Mfg., Inc. (1995), 103 Ohio App.3d 591, 594, overruled on other grounds in Rauhuff v. American Fan Co. (June 21, 1999), Butler App. No. CA98-09-188, unreported, at 19-21; Whitten v. Ohio Blenders, Inc. (July 28, 1989), Lucas App. No. L-88-417, unreported, at 9-10; Moore v. Animal Fair Pet Ctr., Inc. (1995),81 Ohio Misc.2d 46, 51.[3]
Therefore, we find that appellant has no common law intentional tort claim for wrongful discharge pursuant to Balyint. In addition, appellant cannot bring a Greeley cause of action because he was not an employee-at-will. Haynes, supra. Any claim for wrongful discharge in retaliation for filing workers' compensation claims would have to be brought pursuant to and in compliance with the time requirements in R.C. 4321.90.
Appellant next asserts that Haynes, supra, violates federal law. As indicated above, Haynes held that one must have been an at-will employee in order to bring a Greeley cause of action. Haynes at syllabus. Appellant contends that limiting such a cause of action to only at-will employees is in contravention of the holding in Livadas v. Bradshaw (1994),512 U.S. 107, 114 S.Ct. 2068. In Livadas, the California Commissioner of Labor refused to enforce a union employee's claim under a statute that required an employer to pay all wages due an employee immediately upon such employee's discharge. The Commissioner concluded that she could not enforce the employee's claim under the statute because the employee had been a union member subject to a collective bargaining agreement. 512 U.S. at 110. The Supreme Court held that federal law preempted such policy as it abridged the exercise of the employee's rights to bargain collectively under the National Labor Relations Act ("NLRA"). Id. at 110, 116-117. In other words, the California policy forced the employee into choosing between the right under a state statute to have her wage claim enforced by the Commissioner or the right to enter into a collective bargaining agreement. Id. at 117. Because this policy conflicted with the full purpose and objectives of the NLRA, federal law preempted such policy. Id. at 120, 134-135.
Appellant contends the holding in Haynes — that a Greeley cause of action is not available to union employees — preempted by federal law because it confers a right upon at-will employees and denies such right to employees under a collective bargaining agreement. We do not reach the merits of appellant's argument, however, because appellant's assertion rests upon the premise that had he been an at-will employee, he would have had a claim under Greeley. Contrary to his contention, appellant would not have been able to maintain a Greeley claim because he did not comply with the requirements in R.C. 4123.90.
Appellant contends that had he been an at-will employee, he would have been entitled to maintain a Greeley cause of action for wrongful discharge in violation of public policy. Specifically, appellant contends he was discharged in violation of the public policy embodied in R.C. 4123.90. However, appellant did not comply with the time requirements set forth in R.C.4123.90. Appellant contends that under Kulch, an employee need not comply with the statutory requirements in order to obtain relief in a Greeley public policy action. Kulch simply did not so hold. Indeed, Kulch actually held the opposite of what appellant contends.
The employee in Kulch brought a Greeley claim based, in part, upon the public policy embodied in R.C. 4113.52. However, the employee did not comply with certain requirements set forth in a subsection of such statute. Id. at 142. The Supreme Court was clear in holding that if an at-will employee brings a Greeley cause of action based upon public policy embodied in a particular statute, such employee must comply with the requirements set forth in such statute. See Kulch at paragraph three of the syllabus and 154. As to the Supreme Court's holding that the employee did not have to comply with the statutory requirements in R.C. 4113.52, such holding was based on the fact that the employee's Greeley claim was also based on the public policy embodied in Section 660(c), Title 29, U.S. Code (the federal Occupational Safety and Health Act) and Ohio's public policy favoring workplace safety. Id. at 151-154.
It is clear that in order for an at-will employee to bring a Greeley claim based upon the public policy embodied in R.C. 4123.90, such employee must have complied with the requirements set forth in R.C. 4123.90. Appellant did not so comply. Therefore, even if appellant was an at-will employee, he would not have a Greeley claim due to his failure to comply with R.C. 4123.90. In addition, appellant's contention that his wrongful discharge claim is also based upon the public policy embodied in Section 11, Article I of the Ohio Constitution (freedom of speech) is without merit as the prohibitions contained therein apply only to state action, not the actions of a private citizen or employer. See Eastwood Mall, Inc. v. Slanco (1994),68 Ohio St.3d 221, 223. Further, appellant asserts his public policy claim is based upon workers' compensation statutes and administrative rules and regulations which, when considered together, prohibit a self-insured employer from taking any punitive action against an employee for obtaining workers' compensation benefits. We reject appellant's argument, however, as R.C. 4123.90 specifically addresses the punitive action alleged in the case at bar, and the Supreme Court has specifically found such statute sets forth public policy under which a Greeley claim may be brought.
In summary, there is no common law cause of action, beyond a Greeley cause of action, for an intentional tort of wrongful discharge. In addition, even if appellant had been an at-will employee, his Greeley claim would fail because appellant did not comply with the requirements set forth in R.C. 4123.90. Therefore, summary judgment in favor of appellee on the wrongful discharge claim was appropriate. Accordingly, appellant's first assignment of error is overruled.
In his second assignment of error, appellant contends the trial court erred in granting summary judgment to appellee on the defamation claim. In essence, appellant asserts that appellee, through its employees, defamed him by contacting the BWC and requesting appellant be investigated for workers' compensation fraud. Appellant claims that appellee imputed fraudulent, criminal conduct to appellant when appellee knew appellant's conduct was innocent. For the reasons that follow, we conclude that no genuine issue of material fact exists, and appellee is entitled to judgment as a matter of law on appellant's defamation claim.
Defamation is a false publication causing injury to a person's reputation, exposing such person to public contempt, shame, disgrace or ridicule, or adversely affecting such person in his or her trade or business. Liqui-Box Corp. v. Stein (1994),98 Ohio App.3d 481, 483, citing Cleveland Leader Printing Co v. Nethersole (1911), 84 Ohio St. 118. A prima facie case of defamation requires the plaintiff demonstrate: (1) a statement of fact; (2) the statement is false; (3) the statement has a defamatory meaning; (4) the statement is published; and (5) the defendant is guilty of some degree of fault. Liqui-Box at 483. Truth is a complete defense to a claim for defamation. Ed Schory Sons, Inc. v. Soc. Natl. Bank (1996), 75 Ohio St.3d 433, 445. In the case at bar, appellee asserts that any statement it published to the BWC within the applicable time period was true and that any such statement was privileged. We agree and, therefore, summary judgment in favor of appellee was appropriate.
The relevant facts, construed most strongly in favor of appellant, are as follows. Appellant had worked for appellee as an over-the-road driver. Appellant was injured in 1993 and was no longer able to work in this position. Therefore, appellant was reassigned to work as a "yard hostler." This position paid less than his former position, and eventually appellant began receiving a benefit known as "Living Maintenance Wage Loss" ("LMWL") which paid two-thirds of the difference between the wages he earned as a driver and the wages he earned as a yard hostler. In order to receive such a benefit, the employee must be earning a wage. Appellant received LMWL benefits through November 1995.
In September 1995, appellant stopped working due to back and arm pain and "nerves." At this time, appellant was also operating his own business which he had begun in August 1995. Appellee was aware of appellant's business. Appellee began surveillance on appellant in order to determine why appellant was not working. From the week ending September 8, 1995 through November 17, 1995, appellant's wage statements to the BWC showed he was not earning an income. Kathryn C. Mauro, claims examiner in appellee's workers' compensation department, contacted the BWC in December 1995. Ms. Mauro spoke with John Helme, a BWC employee, and told him that appellant was working in his own business and was submitting wage statements showing he was earning no income. Ms. Mauro asked Mr. Helme to refer appellant's situation to the BWC's fraud division because she questioned whether appellant could run his own business while receiving LMWL benefits. Ms. Mauro told Mr. Helme that she suspected fraud, and she asked Mr. Helme to refer the matter to the BWC fraud division and have such division call her back.
The fraud division did not call Ms. Mauro back; therefore, Ms. Mauro and Frank Pagnetta, appellee's injury counselor, determined that Mr. Pagnetta would follow up with the BWC fraud division. Mr. Pagnetta contacted the BWC on or about February 5, 1996 to inform them of appellant's activities and to allow them to make a determination as to whether or not a fraud investigation was warranted. Mark Watson, an employee in the BWC fraud department, was assigned to investigate the claim against appellant. In essence, it was Mr. Watson's understanding that he was investigating whether appellant was entitled to be receiving LMWL benefits.
On February 22, 1996, Mr. Pagnetta spoke with Mr. Watson. Mr. Watson told Mr. Pagnetta that "they have been doing `drive bys.'" On March 5, 1996, Mr. Pagnetta met with Mr. Watson and turned over three video tapes and photographs. On April 17, 1996, Mr. Pagnetta left a message for Mr. Watson as Mr. Pagnetta wanted to update Mr. Watson on recent developments. On April 18, 1996, Mr. Pagnetta spoke with Mr. Watson. Mr. Pagnetta explained to Mr. Watson the outcome of an April 4, 1996 hearing.[4] Mr. Pagnetta's notes regarding such conversation indicate Mr. Watson updated Mr. Pagnetta on his investigation. On July 17, 1996, Mr. Watson interviewed appellant. Appellant showed Mr. Watson the records from his business which indicated appellant had received no income from such business. On July 24, 1996, Ms. Mauro left a message with Mr. Watson. Mr. Watson concluded his investigation in July 1996. The case was terminated as "unfounded" because there was no evidence appellant reported incorrect income to the BWC.
We note initially that the statute of limitations for defamation is one year. R.C. 2305.11(A). Such one-year period begins to run from the time the alleged defamatory words are spoken. See Haller v. Phillips (1990), 69 Ohio App.3d 574, 577; Lyons v. Farmers Ins. Group of Companies (1990), 67 Ohio App.3d 448,450. The complaint herein was filed on February 21, 1997. Therefore, only those statements made on or after February 21, 1996 will be considered in support of appellant's defamation claim.[5] Construing the evidence most strongly in favor of appellant, the only actual statements that were made during this time period were those made by Mr. Pagnetta to the BWC. Specifically, Mr. Pagnetta stated in an affidavit that he told Mr. Watson appellant was not reporting to work as a yard hostler, was running his own excavating company, was submitting wage statements that showed he was not earning a wage, and was receiving LMWL benefits. All of these statements are true. Hence, these statements do not support a claim for defamation.
Appellant further argues that the imputation by appellee of fraudulent conduct constitutes defamation. However, the evidence shows that appellee merely requested that the BWC investigate appellant because appellee believed appellant's activities constituted fraud. Such a statement is not only true appellee did believe appellant's activities constituted fraud — it is privileged as well. A publication is privileged when it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his or her affairs, in matters where such person's interest is concerned. A B-Abell Elevator Co v. Columbus/Cent. Ohio Bldg. Constr. Trades Council (1995), 73 Ohio St.3d 1, 8. The essential elements of a conditionally privileged communication are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. Id.
Here, appellee, a self-insured employer, had been paying workers' compensation benefits that were based upon the difference between wages earned in two different positions. In order to receive such LMWL benefits, the employee had to be earning a wage. Appellant was submitting wage statements indicating he was not earning a wage, yet he was receiving LMWL benefits. Further, appellant was working at his own business. Appellee had a good faith reason to question appellant's activities. It was certainly within appellee's own interest as an employer as well as in the public's interest to question whether or not appellant's actions were proper. In contacting the BWC's fraud division, appellee acted in good faith and communicated to a proper party only that information necessary to make a proper inquiry. Accordingly, any imputation of fraud to appellant made by appellee during the relevant time period was privileged.
Given all of the above, we find summary judgment in favor of appellee on the defamation claim was appropriate. Accordingly, appellant's second assignment of error is overruled.
Because we have overruled each of appellant's assignments of error, appellee's conditional assignments of error are rendered moot.
Having overruled each of appellant's assignments of error, and appellee's conditional assignments of error being moot, the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
DESHLER and PETREE, JJ., concur.
[1] Mr. Stephenson had been granted leave to file an amended complaint adding a fifth claim against Yellow Freight; however, this claim was dismissed on September 24, 1998.
[2] Section 35, Article II of the Ohio Constitution, R.C.4123.74 and R.C. 4123.741 address workers' compensation.
[3] We note that the Moore case is cited only for its conclusion that Balyint is limited to its facts.
[4] The April 4, 1996 hearing apparently stemmed from the denial of appellant's rehabilitation claim.
[5] Appellant contends appellee did not raise the statute of limitations issue below. However, the record shows that appellee raised statute of limitations as a defense in its answer and discussed such defense in its reply memorandum in support of its motion for summary judgment.